UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------X
                         :

DESSERT BEAUTY, INC.             :
                         :

                         :    <u>OPINION AND ORDER</u>
            Plaintiff,     :

   - against -         :    **06 Civ. 2279 (SAS)**
                         :

PLATINUM FUNDING CORP.,   :
                         :

           Defendant.   :
------------------------------------------------------X
                         :

PLATINUM FUNDING CORP.,   :
                         :

       Third Party Plaintiff,   :

   - against -         :

NEIL SHINDER; RANDI SHINDER, and  :
DESSERT BEAUTY HOLDINGS, INC.,   :

      Third Party Defendants.   :
                         :
------------------------------------------------------X

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

## I.    INTRODUCTION

       Dessert Beauty, Inc. ("DBI"), a Barbados corporation, is a

1

manufacturer of cosmetics.[1]  Platinum Funding Corp. ("Platinum"), is a New

Jersey financing company.[2]  This litigation arises from a factoring agreement

between the parties, pursuant to which Platinum purchased accounts receivable

from DBI, advancing a percentage of the face value of such receivables to DBI

upon purchase.[3]  Platinum collected the amounts due on the accounts, and

periodically remitted to DBI the difference between the amount collected on each

receivable and its purchase price, less certain fees and expenses.[4]  DBI seeks

recovery of funds that it contends were wrongfully withheld by Platinum.[5]  DBI's

first Complaint asserted three causes of action:  conversion, money had and

received, and unjust enrichment.[6]  In its Answer, Platinum asserted a counterclaim

against DBI, and a third-party complaint against Neil and Randi Shinder,

Canadian citizens and principals of DBI, and Dessert Beauty Holdings, Inc.

("DBH"), a Canadian Corporation, as guarantors of DBI's obligations to Platinum

---

[1]        *See* Complaint ("Compl.") ¶ 2.

[2]        *See id.* ¶ 3.

[3]        *See id.* ¶¶ 6-8; Answer ("Ans.") ¶¶ 6-8.

[4]        *See* Compl. ¶ 8; Ans. ¶ 8.

[5]        *See* Compl. ¶ 1.

[6]        *See id.* ¶¶ 19-32.

(collectively, "Third Party Defendants"), alleging breach of contract and seeking attorney's fees and costs pursuant to the factoring agreement.[7]  DBI filed a proposed Amended Complaint, which realleges the claims of the first Complaint, asserts a new cause of action for fraudulent inducement, and requests a jury trial.[8] Platinum now moves pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss DBI's fraudulent inducement claim.[9]  Platinum also opposes DBI's request for a jury trial.[10]

## II.     BACKGROUND

### A.     The Parties

DBI is a manufacturer of cosmetics, organized under the laws of Barbados, with a place of business in New York.[11]  Randi Shinder and Neil Shinder, both Canadian residents, are President and Director of DBI,

---

[7]       *See* Ans. (Counterclaims) ¶ 1.

[8]       *See* Amended Complaint ("Amend. Compl."), caption & ¶¶ 23-49.

[9]       *See* 9/19/06 Notice of Motion Pursuant to Fed. R. Civ. P. 12(b)(6) to Dismiss the First Cause of Action of the First Amended Complaint.

[10]      *See* 7/27/06 Letter from Cory Mitchell Gray, former counsel for Defendant, to the Court ("Gray Letter"), at 4 n.4.

[11]      *See* Compl. ¶ 2; Ans. (Counterclaims) ¶ 3.

respectively.[12] Randi Shinder is also President of DBH, a corporation organized under the laws of Canada, which owns one hundred percent of the outstanding shares of DBI.[13] Platinum is a New Jersey corporation that provides factoring services.[14] This Court has jurisdiction over this matter pursuant to section 1332(a) of title 28 of the United States Code.

Factoring is a type of accounts receivable financing characterized by "the discounting of acceptable accounts receivable on a non-recourse, notification basis."[15] A factor purchases accounts receivable at a discount from the invoice amount. In return for the right to collect on the invoice and retain the difference between the invoice amount and the discounted purchase price, the factor assumes the "credit risk on the accounts, defined as the financial inability of the account

---

[12]     *See* Notary Public's Acknowledgment, attachment to 1/28/05 Factoring Agreement between Platinum Funding Corp. and Dessert Beauty, Inc. ("Factoring Agreement"), Ex. A to Compl.; 1/28/05 Performance Guaranty by Neil Shinder ("Neil Shinder Guaranty"), Ex. C to Ans., at 1 (second "whereas clause").

[13]     *See* 1/28/05 Performance Guaranty by DBH ("DBH Guaranty"), Ex. E to Ans., at 1 (introductory paragraph and second "whereas" clause); Notary Public's Acknowledgment, attachment to DBH Guaranty.

[14]     *See* Compl. ¶ 3; Ans. ¶ 3.

[15]     Woelfel, Charles J., *Encyclopedia of Banking & Finance*, at 370 (10th ed. 1994). *See also* Matthew Bender & Co., Inc., 1-1 *Asset Based Financing: A Transactional Guide* § 1.04 (2006).

4

debtor to pay."[16]   The factor typically retains recourse to the account seller in case

other risks result in non-payment, "such as the risk of disputes (e.g., nonpayment

due to nonconforming goods)."[17]   The size of the discount is related to the factor's

assessment of the overall credit risk on the accounts purchased.[18]   As owner of the

account, the factor is typically entitled to receive payment directly from the

account debtor, and to undertake collections activities.[19]

### B.     The Agreements

On January 28, 2005, DBI and Platinum entered into the Factoring

Agreement, which has a term of six months.[20]   When this term expired, DBI and

Platinum renewed the Factoring Agreement for another term, and the renewed

agreement terminated on January 28, 2006.[21]   The Factoring Agreement

incorporated a simultaneously executed and subordinate Purchase and Sale

---

[16]     Matthew Bender & Co. Inc., 1-6 *Commercial Finance Guide* § 6.04(1)(b) (2006).

[17]     *Id.*

[18]     *See* Robert D. Aicher and William J. Fellerhoff, *Characterization of a Transfer of Receivables as a Sale or a Secured Loan Upon Bankruptcy of the Transferor*, 65 Am. Bankr. L.J. 181, 208 (Winter, 1991).

[19]     *See* Woelfel, *supra* note 15, at 370.

[20]     *See* Factoring Agreement ¶ 8.

[21]     *See* Compl. ¶ 12.

5

Agreement, referred to within the Factoring Agreement as the Account

Agreement, which detailed critical aspects of the parties' performances.[22]  Both

agreements contained a choice of law provision stating that the agreements are

governed by the laws of the State of New Jersey.[23]  Under the Factoring

Agreement, DBI undertook to tender accounts receivable to Platinum.[24]  Platinum

retained the right to decline to purchase any particular account receivable.[25]  If

Platinum purchased an account, DBI irrevocably assigned to Platinum the right to

collect payment, and Platinum assumed the credit risk on the account.[26]  Upon

Platinum's purchase of an account receivable, the account debtor was notified to

remit payments directly to Platinum, and Platinum was authorized to undertake

collection.[27]

The purchase price for accounts receivable was determined by a Fee

and Reimbursements Schedule incorporated within the Account Agreement (the

---

[22]     *See* Factoring Agreement ¶ 2. *See also* Purchase and Sale Agreement ("Account Agreement"), Schedule A to Factoring Agreement, ¶ 6.

[23]     *See* Factoring Agreement ¶ 11; Account Agreement ¶ 4.

[24]     *See* Factoring Agreement ¶ 1; Account Agreement ¶ 3.

[25]     *See* Factoring Agreement ¶ 1.

[26]     *See id.*

[27]     *See id.* ¶¶ 1, 5. *See also* Account Agreement ¶ 5.

"Fee Schedule").[28]  According to the Fee Schedule, the purchase price equaled the invoice amount less a discount that increased in proportion to the amount of time after purchase that the invoice remained outstanding.[29]  Invoices collected within thirty days would be purchased for the invoice amount less a three percent discount.[30]  For each additional ten days that an invoice remained outstanding, the discount increased by one percent.[31]  Invoices paid after ninety days, however, were uniformly discounted by fifteen percent of the invoice amount.[32]

The Factoring Agreement contemplated that invoices would be tendered and purchased in batches called Schedules.[33]  Upon acceptance and purchase of a Schedule of receivables, Platinum advanced seventy percent of the aggregate invoice amounts against the total purchase price.[34]  The full purchase price was not payable, however, until all accounts in a Schedule were closed.[35]  An

---

[28]   *See* Account Agreement at 3.

[29]   *See id.*

[30]   *See id.*

[31]   *See id.*

[32]   *See id.*

[33]   *See* Factoring Agreement ¶ 2.

[34]   *See id.  See also* Account Agreement ¶ 1(b).

[35]   *See* Factoring Agreement ¶ 2.

account closed when Platinum received payment in full from the account debtor, when Platinum charged back an unpaid account to DBI, or when DBI repurchased the account at the full invoice amount.[36]  Upon closing, Platinum determined the discount applicable to each account, deducted this amount, and remitted the net balance of the purchase price to DBI.[37]

Paragraph nine of the Factoring Agreement contained a provision that linked the discount fees to be charged by Platinum to the volume of accounts receivable to be tendered by DBI during the six-month term of the agreement (hereinafter, "Paragraph Nine").  Paragraph Nine recited that the discount rates specified in the Fee Schedule were "established after negotiation between the parties based upon the delivery by Seller [DBI] of not less than" fifteen million dollars of valid accounts receivable (termed the "Semi-Annual Base Sales Amount") to Platinum "during each six month period that this Factoring Agreement is in effect (a 'Term Semi-Annual')."[38]  Because the import of the

---

[36]     *See id.*

[37]     *See id.*

[38]     *Id.* ¶ 9.  The Fee Schedule also specified fees for minor services such as preparing credit reports, transferring funds, and sending overnight packages. The fees for most of these incidental items were less than one hundred dollars. *See* Account Agreement at 3.

8

language which follows this recitation is disputed by the parties, I will quote it in full:

> Seller expressly acknowledges that Platinum has agreed thereto in reliance upon Seller's agreement during each Term Semi-Annual to deliver at least the Semi-Annual Base Sales Amount and that *Platinum requires an increased fee in the event that a lesser volume of approved Accounts Receivable is agreed upon in any Term Semi-Annual*. Consequently, if the aggregate amount of approved Accounts Receivable delivered by the Seller to Platinum during any Term Semi- Annual, whether by reason of Seller's premature termination, reduced level of sales, or otherwise, shall be less than the Semi-Annual Base Sales Amount, then Seller shall pay to Platinum an adjustment fee on account of such Term Semi-Annual.[39]

The "adjustment fee" is arrived at by dividing the amount of fees earned by Platinum on the accounts receivable sold by DBI in the Term Semi-Annual, by the aggregate amount of accounts receivable delivered by DBI during the term. This quotient is multiplied by the Semi-Annual Base Sales Amount, and the amount of fees earned by Platinum on the accounts receivable purchased is subtracted from that total.[40] Thus, the adjustment fee is roughly equivalent to a weighted average discount rate for the term, applied to the Semi-Annual Base Sales Amount, less the aggregate fees already collected during that term by

---

[39] *Id.* (emphasis added).

[40] *See id.*

Platinum.

Simultaneously with the execution of the Factoring and Account Agreements, the parties also executed a Security Agreement, by which DBI granted a security interest in all of its "present and future property" as collateral against DBH's obligations under the Factoring and Account Agreements.[41]  The collateral did not secure the payment of accounts receivable purchased pursuant to those agreements.[42]  Randi and Neil Shinder simultaneously executed Guaranty Agreements, by which they guaranteed DBI's performance of its obligations under the Factoring and Account Agreements.[43]  Randi Shinder, as president of the holding company, DBH, executed a guaranty of DBI's obligations to Platinum on behalf of DBH.[44]

## C.    The Dispute

During the first six-month term of the Factoring Agreement, from January 28, 2005 through July 28, 2005, DBI delivered and Platinum purchased

---

[41]    See 1/28/05 Security Agreement, Ex. B to Ans., at 1 (first "whereas" clause), ¶¶ 1-2.

[42]    See id. ¶ 2.

[43]    See Neil Shinder Guaranty ¶ 1; Performance Guaranty by Randi Shinder, Ex. D to Ans., ¶ 1.

[44]    See DBH Guaranty ¶ 1.

$24,636,025.40 of accounts receivable, significantly more than the contractual minimum.[45]  The Factoring Agreement was renewed for a second six-month term, from July 29, 2005 through January 28, 2006, and during this contract term, DBI delivered only $6,395,821.09 of accounts receivable.[46]  Platinum withheld $527,741.92 from DBI's reserve account, informing DBI that the funds were withheld as an adjustment fee pursuant to Paragraph Nine of the Factoring Agreement.[47]  Platinum withheld a further $33,000 as "cash collateral."[48]  DBI contends that Platinum did not have the right to withhold any of these funds.[49] Platinum contends that this cash collateral was withheld in substitution for the security interests in the property of DBI held by Platinum pursuant to the Security Agreement.[50]  Platinum alleges that it relinquished its security interests in that property and retained the cash funds pursuant to negotiations between Platinum

---

[45]     See Compl. ¶ 12.

[46]     See id.

[47]     See id. ¶ 16.  See also Ans. ¶¶ 16, 18; Memorandum of Law in Support of Motion of Defendant Platinum Funding Corp. Pursuant to Fed. R. Civ. P. 12(b)(6) to Dismiss the First Cause of Action of the First Amended Complaint ("Platinum Mem."), at 1.

[48]     Compl. ¶ 18; Ans. ¶ 18.

[49]     See Compl. ¶¶ 18, 21-22.

[50]     See Ans. ¶ 18.

11

and DBI.[51]

### D.    The Pleadings

DBI filed its Complaint on March 3, 2006, and did not request a jury

trial.[52]  Platinum filed its Answer, Third-Party Complaint against Neil and Randi

Shinder and DBH, and its Counterclaim against DBI on April 17, 2006.[53]  On May

8, 2006, DBI filed its Answer to Platinum's Counterclaim and Third Party

Complaint.[54]  This was the last pleading submitted and accepted by the Court.  On

July 25, 2006, DBI informed the Court by letter that it wished to file an amended

complaint to state an additional cause of action for fraudulent inducement, and to

add a demand for a jury trial.[55]  By reply letter, counsel for Platinum opposed

DBI's request for a jury trial.[56]  DBI filed its Proposed First Amended Complaint,

---

[51]    *See id.*

[52]    *See* Compl. (caption).

[53]    *See* Ans.  The Answer contained no demand for a jury trial.

[54]    *See* Plaintiff/Counterclaim Defendant's Reply and Third Party
Defendants' Answer and Affirmative Defenses to Platinum Funding Corp.'s
Counterclaim and Third Party Complaint ("DBI/Third Party Reply"), at 8.

[55]    7/25/06 Letter from Jesse B. Schneider, counsel for plaintiffs, to this
Court ("Schneider Letter"), at 1.

[56]    *See* Gray Letter at 4 n.4.

including a jury demand, on August 3, 2006.[57]

## III.   LEGAL STANDARD

### A.   Motion to Dismiss

A court may not dismiss an action pursuant to Rule 12(b)(6) unless "'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'"[58]  The task of the court is "merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof."[59]  When deciding a motion to dismiss, courts "accept all factual allegations as true and draw all reasonable inferences in plaintiff's favor."[60]  "While the pleading standard is a liberal one, bald assertions and conclusions of law will not suffice."[61]  "Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint

---

[57]     *See* Amend. Compl., caption.

[58]     *Faulkner v. Beer*, 463 F.3d 130, 133 (2d Cir. 2006) (quoting *Twombly v. Bell Atl. Corp.*, 425 F.3d 99, 106 (2d Cir. 2005)).

[59]     *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 176 (2d Cir. 2004) (quotation marks and citation omitted).

[60]     *Ofori-Tenkorang v. American Int'l Group, Inc.*, 460 F.3d 296, 298 (2d Cir. 2006).

[61]     *Amron v. Morgan Stanley Inv. Advisors, Inc.*, 464 F.3d 338, 344 (2d Cir. 2006).

itself."[62]  However, "the complaint is deemed to include any written instrument

attached to it as an exhibit or any statements or documents incorporated in it by

reference."[63]  Although the plaintiff's allegations are taken as true, "the claim may

still fail as a matter of law if it appears beyond doubt that plaintiff can prove no set

of facts in support of its claim which would entitle it to relief, or if the claim is not

legally feasible."[64]

## B.    Choice of Law

A federal court sitting in a diversity case applies the choice of law

rules of the forum state.[65]  "The validity of a contractual choice-of-law clause is a

threshold question that must be decided not under the law specified in the clause,

but under the relevant forum's choice-of-law rules governing the effectiveness of

---

[62]    *Faulkner*, 463 F.3d at 134.

[63]    *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).
*See also Faulkner*, 463 F.3d at 134 (It is permissible to consider the "full text of
documents partially quoted in complaint," and "documents relied upon by plaintiff
in drafting the complaint and integral to the complaint.") (citing *San Leandro
Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801,
808-09 (2d Cir. 1996), and *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42,
47-48 (2d Cir. 1991)).

[64]    *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, No. M21-88,
MDL 1358, 2006 WL 2884392, at *1 (S.D.N.Y. Oct. 10, 2006) (citing *Allaire
Corp. v. Okumus*, 433 F.3d 248, 250 (2d Cir. 2006)).

[65]    *See White Plains Coat & Apron Co. v. Cintas Corp.*, 460 F.3d 281,
284 (2d Cir. 2006).

such clauses."[66]  "When such a provision exists and the jurisdiction chosen by the

parties has a substantial relationship to the parties or their performance, New York

law requires the court to honor the parties' choice."[67]  "[O]nce a court finds that a

contractual choice-of-law clause is valid, the law selected in the clause dictates

how the contract's provisions should be interpreted."[68]  The Factoring Agreement

contains a choice of law provision specifying that the agreement is governed by

New Jersey law.[69]  However, "[u]nder New York law . . . tort claims are outside

the scope of contractual choice-of-law provisions that specify what law governs

construction of the terms of the contract."[70]

      "New York courts have not directly ruled on which state's substantive

law is to be applied to a fraud claim."[71]  However, "[t]he local law of the state

which has the most significant relationship with the occurrence and with the

---

[66]    *Finance One Pub. Co. v. Lehman Bros. Special Fin., Inc.*, 414 F.3d 325, 332 (2d Cir. 2005).

[67]    *Woodling v. Garrett Corp.*, 813 F.2d 543, 551 (2d Cir. 1987) (citing *A.S. Rampell, Inc. v. Hyster Co.*, 3 N.Y.2d 369, 381 (1957)).

[68]    *Id.*

[69]    *See* Factoring Agreement ¶ 11.

[70]    *Finance One*, 414 F.3d at 335.

[71]    *Krock v. Lipsay*, 97 F.3d 640, 646 (2d Cir. 1996).

15

parties determines their rights and liabilities in tort."[72] The parties have not

briefed the potentially complex choice of law issues relating to DBI's fraudulent

inducement claim, each choosing to deal with the question in a single, brief

footnote.[73] Thus, this Court has scant information on which to base a

determination as to what "state . . . has the most significant relationship with the

occurrence."[74] For example, the pleadings and other papers submitted by the

parties do not state where Platinum's allegedly fraudulent acts occurred, or where

the injury to DBI accrued. Platinum states that both states have an "equal interest"

in this litigation, but briefed the fraudulent inducement issue applying New York

law.[75] DBI incorrectly assumed that the agreement's choice of law provision

encompassed the fraudulent inducement claim, and briefed that issue applying

New Jersey law.[76] Both parties have expressed the belief that the law of fraudulent

inducement is substantially the same in New York and New Jersey.[77]

---

[72]     *Babcock v. Jackson*, 12 N.Y.2d 473, 482 (1963).

[73]     *See* Opposition to Defendant Platinum Funding Corporation's Partial Motion to Dismiss ("DBI Mem."), at 7 n.2; Platinum Mem. at 5 n.7.

[74]     *Babcock*, 12 N.Y.2d at 482.

[75]     Platinum Mem. at 5 n.7.

[76]     *See* DBI Mem. at 7 n.2.

[77]     *See id.*; Platinum Mem. at 5 n.7.

Although the choice of law provision does not determine which state's law should apply to the tort claim, it is evidence that the parties anticipated that their dealings would have a substantial connection to New Jersey. Furthermore, Platinum is a New Jersey corporation. In view of the absence of other factual information on which to base a choice of law determination, these facts suggest that New Jersey has the most significant connection with the occurrences underlying DBI's fraudulent inducement claim. Accordingly, I will apply New Jersey law.

## C.   Fraudulent Inducement and the Rule 9(b) Pleading Standard

On a motion to dismiss, a complaint pleading a claim of fraud must allege each of the elements of the claim as defined by state law, and must also meet the heightened pleading requirements of Federal Rule of Civil Procedure 9(b).[78] "The particularity requirement of Rule 9(b) serves to provide a defendant with fair notice of a plaintiff's claim, to safeguard a defendant's reputation from improvident charges of wrongdoing, and to protect a defendant against the

---

[78]   *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 291 (2d Cir. 2006) (applying Rule 9(b) to New York common law fraud claims). *See also Eternity Global Master Fund*, 375 F.3d at 187 (same).

17

institution of a strike suit."[79]

Under New Jersey law, there are five elements to a claim of fraudulent inducement: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon; and (5) resulting damages."[80]  "Fraud in the inducement occurs when the victim['s] consent to [a] bargain is obtained by lies or half-truths."[81]  It is a "misrepresentation as to the terms, quality or other aspects of a contractual relation . . . that leads a person to agree to enter into the transaction with a false impression or understanding of the risks, duties or obligations she has undertaken."[82]

A misrepresentation is "an assertion that is not in accord with the facts."[83]  Thus, only matters of fact can be misrepresented.  Furthermore, "statements as to future or contingent events, to expectations or to probabilities, or

---

[79]    *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (quotations omitted).

[80]    *Alexander v. CIGNA Corp.*, 991 F. Supp. 427, 434 (D.N.J. 1998). *Accord Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610 (1997).

[81]    *American Fin. Servs. Group, Inc. v. Treasure Bay Gaming & Resorts, Inc.*, No. 99 Civ. 1068, 2000 WL 815894, at *4 (S.D.N.Y. June 23, 2000).

[82]    Black's Law Dictionary 661 (6th ed. 1990).

[83]    Restatement (Second) of Contracts § 159 (1979).

as to what will or will not be done in the future, do not constitute misrepresentations, even though they may turn out to be wrong."[84]  A party's unconditional statement of a present intention to perform or refrain from performing an act in the future is factual, and can be the subject of misrepresentation.[85]  "The misrepresentation must be of a material fact. Materiality requires a showing that the misrepresentation would have been likely to have induced a reasonable person to enter into the contract."[86]

The two elements of fraudulent inducement that relate to the mental state of the defendant are referred to collectively as scienter.[87]  "Scienter need not be alleged with great specificity."[88]  "A common method for establishing a strong inference of scienter is to allege facts showing a motive for committing fraud and

---

[84]     *Alexander*, 991 F. Supp. at 434.

[85]     *See Comfort Spring Corp. v. Brooks Equip. Corp.*, 13 N.J. Super. 564, 567 (App. Div. 1951) ("[T]he state of a man's mind is as much a fact as the state of his digestion.").  *See also Lightning Lube v. Witco Corp.*, 4 F.3d 1153, 1186 (3d Cir. 1993).

[86]     *Technoclima S.p.A. v. PJC Group of N.Y.*, 89 Civ. 4437, 1993 WL 404109, at *8 (S.D.N.Y. Oct. 1, 1993) (applying New York law).  *Accord In re Allegheny Int'l, Inc.*, 954 F.2d 167, 179 (3d Cir. 1992) (applying Pennsylvania law).

[87]     *See Capano v. Borough of Stone Harbor*, 530 F. Supp. 1254, 1264 (D.N.J. 1982).

[88]     *Ouaknine v. MacFarlane*, 897 F.2d 75, 79 (2d Cir. 1990).

19

a clear opportunity for doing so.  Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater."[89]

"One of the essential elements of a cause of action for fraud is reliance and a plaintiff must demonstrate that reliance upon any representation was justified and reasonable."[90]  However, "reasonable reliance is a fact-specific inquiry generally considered inappropriate for determination on a motion to dismiss, [although] whether a plaintiff has adequately pleaded justifiable reliance can be a proper subject for a motion to dismiss."[91]

### D.    Jury Trial

"A party may demand a trial by jury of any issue triable of right by jury . . . at any time after the commencement of the action and not later than 10 days after the service of the last pleading directed to such issue."[92]  "Under

---

[89]    *Beck v. Manufacturers Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987).

[90]    *Fleming Cos. v. Thriftway Medford Lakes*, 913 F. Supp. 837, 844 (D.N.J. 1995).

[91]    *Allied Irish Banks v. Bank of America*, No. 03 Civ. 3748, 2006 WL 278138, at *8 (S.D.N.Y. Feb. 2, 2006).

[92]    Fed. R. Civ. P. 38(b).

[Federal Rule of Civil Procedure] 38(d), the failure to demand a jury trial within the period designated by Rule 38(b) constitutes a waiver of that right as to all issues raised in the complaint."[93] "In this Circuit, amendments to the pleadings revive the right to a jury trial only if the amendments involve new issues or change the original issues."[94]

## IV.   DISCUSSION

### A.   DBI's Fraudulent Inducement Claim

For the purposes of ruling on this motion, I assume, as I must, that all of DBI's factual allegations are true.[95]  As such, at this early stage, I find that DBI has stated a claim for fraudulent inducement.

DBI's claim of fraud arises out of the statement contained in Paragraph Nine that "Platinum requires an increased fee in the event a lesser volume of approved Accounts Receivable is agreed upon in any Term Semi-Annual."[96]  By that statement, DBI argues, Platinum represented that its general policy was to offer its customers lower rates *only if* they agreed to a fifteen million

---

[93]    *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1310 (2d Cir. 1973) (en banc).

[94]    *Tuff-N-Rumble Mgmt., Inc. v. Sugarhill Music Publ'g, Inc.*, 75 F. Supp. 2d 242, 246 (S.D.N.Y. 1999).

[95]    *See Ofori-Tenkorang*, 460 F.3d at 298.

[96]    Factoring Agreement ¶ 9.  *See* Amend. Compl. ¶ 25.

21

dollar minimum.  DBI claims that this amounts to a material representation.[97]  The

representation is clearly one of present or past fact, and as such, can support a

claim of fraudulent inducement.  Moreover, Plaintiff alleges in its Amended

Complaint that the statement was false and that in fact, "Platinum does not require

an increased Fee in the event a lesser volume of approved Accounts Receivable is

agreed upon by its customers."[98]  Taking Platinum's interpretation and allegations

of materiality and falsity of that statement as true, the statement in Paragraph Nine

is sufficient to form the basis of a fraudulent inducement claim.[99]

DBI's Amended Complaint also contains adequate allegations of

scienter, which may be pled in general terms.[100]  DBI states that "Platinum made

this materially false representation . . . with the intent to induce Dessert . . . to

---

[97]     *See* Amend. Compl. ¶ 25.

[98]     *Id.* ¶ 26.  *See also id.* ¶ 14.

[99]     I note that DBI in its memorandum offers an alternative interpretation
of the statement in Paragraph Nine, namely that Platinum represented that
"Platinum . . . would have charged Dessert a higher fee had Dessert not agreed to
this minimum." Pl. Mem. at 14.  That interpretation imputes a statement of
condition to the language, which cannot support a claim of fraud because
"statements as to . . . contingent events . . . do not constitute misrepresentations."
*Alexander*, 991 F. Supp. at 435.  However, because I find that the statement can be
read as a statement of fact sufficient to support a claim of fraud, this alternative
interpretation is irrelevant and need not be considered.

[100]     *See Ouaknine*, 897 F.2d at 79.

agree to a Semi-Annual Base Sales Amount of $15 million."[101]  This allegation is sufficient to give rise to motive and opportunity to commit fraud.  Platinum had a financial incentive to make the misrepresentation in Paragraph Nine in order to obtain the fifteen million dollar minimum and the ability to invoke the penalty provision of Paragraph Nine in the event the minimum were not achieved.[102]  Moreover, DBI also identifies circumstances indicating conscious misbehavior by Platinum.  Specifically, DBI claims that at the time the parties entered into the agreement, "Platinum knew that the representation contained in paragraph 9 . . . was false" because, as a practical matter, Platinum knows what it does and does not require of its customers and that in fact the Fee and Reimbursement Schedule that was made part of the Factoring Agreement "is the same fee schedule Platinum incorporates into all of its contracts."[103]  At the motion to dismiss stage, these allegations are sufficient to give rise to a strong inference of fraudulent intent.

The remaining elements of a fraudulent inducement claim, reliance and damages, are each specifically pleaded.  DBI alleges that it was unaware of the falsity of the statement in Paragraph Nine and that it agreed to the fifteen million

---

[101]     Amend. Compl. ¶ 27.

[102]     *See id.* ¶¶ 11, 14, 27.

[103]     *Id.* ¶ 26.

23

dollar minimum only because it believed it was being charged a lower fee.[104]  DBI

claims it was harmed to the extent that, had Platinum not represented that it

charged higher fees to lower-volume clients, DBI would not have agreed to the

adjustment fee provision of Paragraph Nine, but instead "would have insisted on

either no Semi-Annual Base Sales Amount or the lowest Semi-Annual Base Sales

Amount offered by Platinum to its customers."[105]  DBI states that its damages are

$573,741.92.[106]  This amount is equal to the entire adjustment fee and cash

collateral retained by Platinum.[107]  In sum, DBI meets the pleading requirements

for fraudulent inducement under both New Jersey law and Rule 9(b).

### B.    DBI's Request for a Jury Trial

The last pleading submitted and accepted by this Court was DBI's

Answer to Platinum's Counterclaim and Third Party Complaint, filed on May 8,

2006.[108]  DBI gave notice of its desire for a jury trial on July 25, 2006, well after

---

[104]    *See id.* ¶¶ 11, 28, 29.

[105]    *Id.* ¶ 29.

[106]    *Id.* ¶ 30.

[107]    The parties agree that the adjustment fee retained by Platinum was
$527,741.92.  *See id.* ¶ 22; Ans. ¶ 18.  DBI's original Complaint and Platinum's
Answer both stated that Platinum retained $33,000.00 in cash collateral.  *See*
Compl. ¶ 22; Ans. ¶ 18.  DBI now states that the amount of cash collateral
withheld was $46,000.  *See* Amend. Compl. ¶ 22.

[108]    *See* DBI/Third Party Reply.

24

the expiration of the ten-day period specified in Rule 38(b).[109]  Accordingly, a jury

trial has been waived as to all issues in the original pleadings.  DBI's Amended

Complaint raises one new claim, and realleges DBI's other claims in substantially

the same form as in the original Complaint.  DBI's amended pleading allows it to

request a trial by jury, but only on the claim that was raised for the first time in the

Amended Complaint.

## V.    CONCLUSION

DBI has alleged sufficient facts to plead its claim of fraudulent

inducement.  Accordingly, Platinum's motion to dismiss this claim is denied.  The

Clerk of the Court is directed to close this motion [docket no. 17].  A conference is

scheduled for February 7, 2007 at 4:30 P.M.


SO ORDERED:


Shira A. Scheindlin
U.S.D.J.


Dated:      New York, New York
            December 14, 2006


---

[109]    Schneider Letter at 1.

25

## -Appearances-

**For Plaintiff/Counterclaim Defendant Dessert Beauty, Inc.
and Third Party Defendants Neil Shinder, Randi Shinder, and
Dessert Beauty Holdings, Inc.:**

Howard J. Rubin, Esq.
Jesse B. Schneider, Esq.
Scott M. Singer, Esq.
DAVIS AND GILBERT L.L.P.
1740 Broadway
New York, NY 10019
(212) 468-4800

**For Defendant/Counterclaimant/Third Party Plaintiff
Platinum Funding Corp.:**

Esther S. Trakinski, Esq.
752 West End Avenue, Suite 14C
New York, N.Y. 10025
(917) 748-1543